# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| **GEORGE E. SEIDLE, JR.,** | * | **CHAPTER 13** |
| Debtor | * | |
| | * | **CASE NO. 1:10-bk-01645MDF** |
| **GEORGE E. SEIDLE, JR.,** | * | |
| Plaintiff | * | |
| | * | |
| v. | * | **ADV. NO.  1:10-ap-00354MDF** |
| | * | |
| **SOVEREIGN BANK, et. al.,** | * | |
| Defendants | * | |

## OPINION

George E. Seidle, Jr. ("Debtor") filed the within adversary complaint on September 22, 2010 requesting the Court to determine the priority of liens against his residence held by Sovereign Bank ("Sovereign"),  J.P. Morgan Chase ("Chase"), Metro Bank ("Metro") and certain judgment creditors. Debtor also sought a determination of the extent to which the liens were secured claims.[1]  The lien priority issue was submitted to mediation upon the consent of Sovereign and Chase.[2] Following  mediation, Sovereign agreed to subordinate its mortgage to Chase's lien.  Thus, the sole issue to be resolved by the Court is the value of the residence, which will determine the extent to which Sovereign's claim is secured.  For the reasons discussed below, I find the value of the residence to be $109,000.

---

[1]The judgment creditors named in the Complaint were Sudden Death Termite, Citibank South Dakota, Discover Bank, Capital One Bank, Arrow Financial Services, Asset Acceptance and David Bennett.

[2]Default judgment against Metro was entered on August 31, 2011 for failure to prosecute.

## I. Procedural History

On March 2, 2010, Debtor filed a Chapter 13 bankruptcy petition. On Schedule A, he listed his residence at 813 Wertzville Road, Enola, Pennsylvania (hereinafter, the "Residence") and reported its fair market value to be $145,000. In his schedules, Debtor stated that Chase had a claim of $102,284.85 and Sovereign had a claim of $89,200.00. Chase and Sovereign filed proofs of claims of $102,450.12 and $119,334.03, respectively, and each creditor asserted that its claim was secured by the Residence.

On September 22, 2010, Debtor brought the within adversary proceeding seeking a determination that Sovereign's lien was subordinate to that of Chase. Debtor argued that a finding that Chase was in a first lien position would permit Sovereign's lien to be stripped off under 11 U.S.C. § 506(a)(1). Debtor's Complaint also sought to strip off the third mortgage held by Metro and the judgment liens of the other defendants. Metro filed an Answer to the Complaint on September 30, 2010, and Sovereign filed an Answer on October 11, 2010.

On January 17, 2011, Debtor filed an Amended Complaint eliminating the counts against the judgment creditors. Sovereign filed an Answer to the Amended Complaint on February 11, 2011. No Answer was filed either by Metro or by Chase. In its Answer, Sovereign asserted that its mortgage constituted a first lien against the Residence, but even if it was in second lien position, there was equity above the amount of Chase's lien to which its lien attached.

Trial of the adversary case was held on August 31, 2011. Metro did not appear at the trial so the Court granted Debtor's request for a default judgment against Metro. Briefs were filed by Debtor and Sovereign, and the matter was submitted for decision. After reviewing the record, the Court determined that Chase had not been served with Sovereign's Answer and so was

2

unaware that Sovereign had asserted that its lien was superior to that held by Chase. An order was issued on January 10, 2012 directing Sovereign to serve Chase with its Answer. Chase filed a Response to Sovereign's Answer on February 16, 2012 asserting that its lien was superior to Sovereign's lien.

On May 4, 2012, Debtor, Chase, and Sovereign agreed to have the lien priority issue heard by a mediator. Following mediation, the parties filed a stipulation in which they agreed that Chase held the first priority lien on the Residence. Chase filed a proof of claim of $102,450.12, which has not been objected to by any party. Thus, the only issue that remains to be decided in this matter is the value of the Residence.[3]

## II. Factual Findings

The Residence is a 962 square-foot ranch-style home built in 1951 on a .3 acre lot in a suburban, residential neighborhood. It has four rooms above grade, including a kitchen/living area, two bedrooms, and one bath. There is a garage and family room below grade. The kitchen and bathroom have not been updated recently and are in fair to average condition. Part of the lower level garage and family room were damaged in a fire that occurred in December 2007 when a faulty electrical component in Debtor's 2005 Dodge Durango caused the engine to ignite. The fire caused extensive damage to the garage and family room, but it did not render the Residence uninhabitable.

---

[3]I have jurisdiction pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A), (B), (K), (L) and (O). This Opinion and Order constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.") 7052, which is applicable to contested matters pursuant to Fed. R Bankr. P. 9014.

In January or February 2008, Debtor received $9000 in insurance proceeds to fund the restoration of the garage and family room damaged by the fire. Debtor testified that his insurance carrier would have paid additional costs of repair upon receipt of proof that the repairs had been made. Debtor testified that he spent approximately $7000 at a building products retailer to purchase a garage door, a bay window, and other materials necessary to repair the fire damage. Nevertheless, the Residence remained in a state of disrepair at the time the appraisals were performed in 2010 and 2011.

On October 9, 2010, G. Arthur Calaman ("Calaman") conducted an appraisal of the Residence at Debtor's request. Certain photographs he took in the course of performing the appraisal were admitted into evidence. Calaman's testimony and photographs demonstrated that the lower level of the Residence had not been repaired. The finished basement and garage were filled with debris, and Calaman verified that these areas remained unusable as living space. Based on his review of the Residence and recent sales of comparable properties, Calaman estimated that the market value of the Residence was $86,500 as of October 9, 2010.

On March 10, 2011, Steven Barrett ("Barrett") performed an appraisal of the Residence at Sovereign's request. Barrett's photographs demonstrate that six months after Calaman performed his appraisal, repairs to the Residence were not yet completed. Barrett valued the Residence as of the date of his inspection and also performed a second valuation as of the date of the petition, March 2, 2010. The retrospective valuation was based upon an examination of comparable property sales during the six-month period before the petition was filed. Based on his

4

inspection of the Residence and review of sales of comparable properties prior to March 2010, Barrett estimated the market value of the Residence to have been $114,000 as of March 2, 2010.[4]

### III. Discussion

In the matter before me, Debtor seeks to strip off Sovereign's second mortgage lien against the Residence pursuant to 11 U.S.C. § 506(a)(1), which provides:

> [a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest, . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C.A. § 506(a)(1).

Generally, the rights of a holder of a claim secured only by a security interest in real property that serves as a debtor's principal residence may not be modified in a Chapter 13 bankruptcy. *See* 11 U.S.C. § 1322(b)(2). However, a junior lien may be determined to be unsecured if a superior lien is equal to or in excess of the value of the property. *In re Erb*, 2011 WL 2600647 at *2 (Case No. 1:10-bk-08958MDF, Bankr. M.D. Pa. June 29, 2011) (citing *McDonald v. Master Financial, Inc. (In re McDonald),* 205 F.3d 606, 611 (3d Cir.2000), *cert. denied,* 531 U.S. 822 (2000) ("a wholly unsecured mortgage holder does not have a secured claim"). In this case, if the value of the Residence is less than or equal to Chase's claim of $102,450.12, then Sovereign's claim is unsecured under § 506(a)(1).

---

[4]Barrett valued the Residence at $111,000 as of March 10, 2011.

5

Value determinations under § 506(a)(1) for purposes of Chapter 13 plan confirmation are typically made as of the date of confirmation. *See In re Backenstoes*, 2012 WL 4793501 (No. 1:10-BK-04473MDF, Bankr. M.D. Pa. Oct. 8, 2012). However, in this case the parties stipulated that the date of valuation should be the date Debtor's bankruptcy petition was filed. Evidence as to the value of the Residence was adduced through testimony from two qualified real estate appraisers, each of whom arrived at their conclusions through the comparable sales approach. This approach is "generally accepted [as] the 'best evidence of market value' in cases where a court must determine the value of real property." *In re Erb*, 2011 WL 200647 at *3 (citation omitted). Barrett's retrospective appraisal was made as of the date of the petition, but Debtor's appraiser valued the Residence as of October 9, 2010, seven months after the petition was filed. Although comparable sales six months before the valuation date are generally regarded as the most reliable indicators of value, the evidence presented by both appraisers suggests that the values of comparable properties and of the Residence did not vary significantly between 2010 and 2011. *See In re Jones*, 2004 WL 298612 at *2 (No. 03-84129, Bankr. C.D. Ill. Feb. 5, 2004) ("Comparable sales within six months of the valuation date for the subject property are preferred, although in a stable market or where sales activity is low, a period of one to two years is acceptable.") (citing Miller & Gallager*, Residential Real Estate Appraisal* 232, 234 (3d ed. 1998)). Accordingly, I will consider both Debtor's October 2010 appraisal and Sovereign's March 2010 appraisal as evidence of the value of the Residence as of March 2, 2010.

As indicated in the Factual Findings, Calaman valued the Residence at $86,500, and Barrett valued the Residence at $114,000. "When weighing conflicting appraisal testimony, courts generally evaluate a number of factors, including: the appraiser's education, training,

6

experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented." *In re Smith*, 267 B.R. 568, 572–73 (Bankr. S.D. Ohio 2001) (quoting *Buckland v. Household Realty Corp. (In re Buckland))*, 123 B.R. 573, 578 (Bankr. S.D. Ohio 1991); *In re American HomePatient, Inc.,* 298 B.R. 152, 173–174 (Bankr. M.D. Tenn. 2003) (quoting *In re Smith,* 267 B.R. at 572-73). "A bankruptcy court is not bound to accept the values contained in the parties' appraisals; rather, it may form its own opinion considering the appraisals and expert testimony." *In re Smith*, 267 B.R. at 573. *See also In re Backenstoes*, 2012 WL 4793501 at *11; *In re Abruzzo,* 249 B.R. 78, 86 (Bankr. E.D. Pa. 2000) ("I am left to some extent with the proverbial battle of the appraisers. Finding merit to both their positions, the only conclusion I can reach is to find some value in between.")

   *A.  Analysis of the appraisals*

   Both appraisers have significant experience in the field – Barrett since 1974 and Calaman since 1985.  Barrett holds professional certifications and designations from the Appraisal Institute and the American Society of Appraisers that Calaman does not hold, but both appraisers are fully competent to offer an opinion on the value of the Residence.

   Both appraisers prepared detailed reports and were equally familiar with the Residence and the surrounding area. The appraisals by both professionals were thorough and well supported.  Thus the instant decision turns on the quality of their comparable sales and their general ability to substantiate the values they offered.

   Calaman used as comparables sales three properties that were sold in March, July, and October 2010. The March sale occurred about the time the petition was filed, but the July and

7

October sales occurred after the bankruptcy was commenced. Two of the comparable sales selected by Calaman are significantly different from the Residence. The property located on Brick Church Road has only 624 square feet of living space and an estimated age of eighty years. Unlike the Residence, it has no central air conditioning system, no integral garage, and is clad with aluminum siding as compared to the brick construction of the Residence. Calaman's third comparable sale, Salt Road, is 60% larger than the Residence (1562 square feet). The Salt Road property also has no central air, no integral garage, and no brick construction. Of the three properties cited in Calaman's appraisal, the Arnold Road property was most similar in size (1000 square feet) and age (57 years) to the Residence, but it also lacked central air, an integral garage, and brick construction. In July 2010, the Arnold Road property sold for $110,000. The adjusted values for the three comparable properties considered by Calaman were $86,472, $96,512, and $83,032. Considering each of the properties equally, he established an appraised value of $86,500 as of October 9, 2010.

Barrett used three comparable sales from 2009 that closed before the petition was filed. He physically inspected the Residence on March 10, 2011 and provided a retrospective estimate of value as of March 2, 2010. His first comparable property was a ranch-style home located adjacent to the Residence that sold for $142,000 in December 2009. With 962 square feet of living space on a .3-acre lot and a 1957 construction date, it is close in age and identical in size to the Residence. It differs from the Residence in that it does not have an integral garage, but it does have a full bath in the basement and a deck within a fenced yard. Also, unlike the Residence, the adjacent comparable property has been renovated and was in good condition on the appraisal date. Because of the unrepaired fire damage and the inferior condition of the

8

Residence when compared to the adjoining property, Barrett estimated that the adjusted value was $117,460.

Barrett's other comparables were both ranch-style homes similar in size and age to the Residence. The adjusted values of the two remaining comparables were $114,200 and $109,212. To arrive at his valuation of the Residence, Barrett deducted 8% of each property's sales price to account for their relatively superior condition and also deducted a flat $10,000 to account for the fire damage, which was similar to the amount of insurance proceeds that Debtor had received ($9000) to pay for repairs. No further adjustments were made to the Helen Road property, but the Sharon Road property also was adjusted downward for its slightly larger size and the financing costs assumed by the seller at closing.

Having examined the testimony and appraisal reports submitted by the appraisers, I find that Barrett's opinion is more persuasive. The comparable sales are more closely related in time to the date of appraisal and fewer adjustments to the sale prices were required. The selection of an adjacent property of similar construction, if not condition, provides the most significant support to the value offered. However, I also find that Barrett may have underestimated the extent to which the condition of the Residence impaired its value. The lower end of the range of values set forth in his appraisal more accurately reflects the current condition of the Residence. Accordingly, the Court finds that the value of the Residence on the date the petition was filed to be $109,000. As such, Sovereign's lien is partially secured by equity in the residence and is subject to the anti-modification provisions of § 1322(b)(2).

9

## B. *Effect of the fire damage on value*

It is abundantly clear from the photographic evidence and testimony of both appraisers that the fire damage significantly reduced the value of the Residence.  As indicated in the Factual Findings, the damage occurred in December 2007 and had not been repaired three years later. This state of affairs was not due to Debtor's lack of insurance or other funding for the repairs.[5] Indeed, he received significant sums of money from his insurance carrier along with its assurance that the costs of further necessary repairs would be reimbursed upon proof of that the repairs had been made.  He received an even greater sum from Chrysler as compensation for the fire damage, which he was ordered to devote to repairing the Residence, but which he failed to do.

Debtor's excuses for failing to repair the property ring hollow.  He testified that he possessed the skills to do the work himself, but blamed his failure to do so on his poor health. However, he does not explain why he did not hire professionals to perform the work, which is difficult to comprehend when he testified that his insurance carrier would have reimbursed his expenses.  More generally, Debtor was not credible as a witness. Most notably, when asked why he could not produce any receipts for materials he had allegedly purchased to repair the fire damage, he responded that he had "lost all [his] invoices and stuff when the fire happened."

---

[5]On a date undisclosed in the record, Debtor filed a lawsuit against Chrysler Corporation and others seeking damages for losses sustained as a result of the fire caused by the Dodge Durango.  On January 17, 2011, Debtor filed a motion in this Court to approve an agreement that had been reached among the parties to that case under which Debtor was to receive $15,176.15 in settlement of his claim.  The Order that approved the settlement provided that the balance received by Debtor was "to be used to repair the fire damage to the real estate."  (Sovereign Bank Ex. 14.)

(N.T. 63). Obviously, this response is a non sequitur and suggests that the funds were used for purposes other than to purchase materials to repair his home.

In its brief, Sovereign asserts that it would be inequitable to permit Debtor to strip off its lien when he could have made the repairs necessary to preserve the value of the Residence. Although I appreciate Sovereign's desire to have the Court rule that debtors who engage in such tactics will not be rewarded for their actions, having determined that there is adequate equity to partially secure Sovereign's lien, it is not necessary for me to reach this issue.

### III. Conclusion

For the reasons discussed above, the value of Debtor's residence is determined to be $109,000, and Sovereign's lien may not be modified through Debtor's Chapter 13 plan. An appropriate Order will be entered.

**By the Court,**

Chief Bankruptcy Judge

Date: March 6, 2013

11